GILBERT EISENBERG, ESQ.   (SBN:  28900)
LAW OFFICE OF GILBERT EISENBERG
819 Eddy Street
San Francisco, CA 94109
(415) 433-3476     BUSINESS
(415) 296-8734     FACSIMILE
gilbert.eisenberg@gmail.com EMAIL

Attorney for Bernardo Leyva Olivas

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CASE NO. 18-CR-00240 CRB |
| ) | |
| Plaintiff, ) | |
| ) | DEFENDANT'S SENTENCING |
| v. ) | MEMORANDUM AND MOTION |
| ) | FOR DOWNWARD VARIANCE |
| BERNARDO LEYVA OLIVAS, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |

**I.**

**INTRODUCTION**

Mr. Olivas respectfully asks the Court to impose a sentence of 30

months of imprisonment, following which Mr. Olivas will be removed from the

United States and returned to his native Mexico.  Mr. Olivas, a destitute sixty-

three-year-old man who did not commit his first drug trafficking offense until

he was 62, poses no threat to the public and will essentially be warehoused in federal prison from his sentencing until he is released.

The offense in this case is as old as the drug trade:  a sophisticated drug trafficker utilized a poor, uninformed, desperate patsy to act as a mule and assume all the risk for transporting the trafficker's narcotics, in exchange for a pittance.  Typically, Mr. Olivas was a highly desirable tool for the trafficker to use because he knew almost nothing about the underlying drug distribution organization and would therefore be unable to cooperate with law enforcement in the event he was arrested.  In sum, Mr. Olivas unwittingly fulfilled exactly the role for which he was hired.

Mr. Olivas made a serious mistake and committed a serious crime. However, his age and his impending separation from his family when he is deported mean Mr. Olivas's incarceration will cause him more serious harm than the typical offender.  Moreover, his lack of prior serious criminality and the fact he committed his crime while under acute financial duress indicate his crime was aberrant and he will not likely re-offend.  Finally, his co-defendant and stepson, Carlos Luna Rodriguez, was recently sentenced to 15 months imprisonment on the same crime.

All of these factors militate in favor of a sentence well below the applicable Guidelines range.  Probation recommends a variance to 87 months imprisonment.  See PSR, Sentencing Recommendation. Mr. Olivas asserts a

sentence of 30 months imprisonment would be adequate to achieve the goals of 18 U.S.C. section 3553 and the Sentencing Commission.

## II.

### GUIDELINES CALCULATIONS

Mr. Olivas agrees with the base offense level and criminal history calculations set out in the Presentence Report ("PSR").  *See* PSR at ¶¶ 21-3. The PSR calculates Mr. Olivas's final offense level is 33 and his criminal history category is I.  This results in a Guidelines rage of 135 to 168 months imprisonment, in Zone D of the sentencing table.  *See* PSR at ¶ 64.

Mr. Olivas disagrees with the PSR offense level calculations in regard to a potential adjustment for his role in the offense. Probation recommends that Mr. Olivas not receive an offense level adjustment for minor role. *See* PSR at ¶ 17.  As argued below, Mr. Olivas asserts he is plainly far less culpable than the other members of the drug trafficking organization that employed him and Mr. Rodriguez and that the Court should therefore apply a minor role adjustment.

If a four-point reduction pursuant to Guidelines § 3B1.2(a), Mr. Olivas's final offense level would be 29, for a range of 87-108 months imprisonment.

## II.

### THE OFFENSE CONDUCT

The Presentence Report accurately reflects the plea agreement and Mr. Olivas offense conduct.  See PSR ¶¶ 4-16.  However, concerning Mr. Olivas's role in the offense, the PSR fails to explain in full the nature of Mr. Olivas's

communications with the supplier of the drugs Mr. Olivas agreed to drive to Washington.  See PSR ¶ 14.  Mr. Oliva met the supplier in a bar in the Fontana area and had no prior relationship with him.  When the supplier proposed to pay Mr. Oliva $10,000 to drive the drugs to Washington, Mr. Oliva had no idea where the drugs would come from or even the suppliers true name.  Mr. Oliva similarly had no idea of the true identity of the person in Washington to whom he would deliver the drugs, or the location where he would complete the delivery; he was merely provided the number of a "burner" cell phone to call when he got to Washington.  *See* Plea Agreement ¶ 2.

Mr. Olivas knowledge of the membership, scope and methods of the drug trafficking organization that hire is exceedingly limited.  In fact, to this day he knows almost nothing about the organization.  However, given that the organization was apparently the target of a federal wiretap investigation and operated in Mexico, California and Washington, the Court may safely assume the organization is extensive.

### III.

### MR. LEYVA'S HISTORY AND CHARACTERISTICS

Mr. Leyva agrees that the PSR's rendition of his personal, educational and work history is accurate.  *See* PSR at ¶¶ 46-59.  One additional aspect of Mr. Olivas's history that bears on the Court's sentencing decision in this case is that while Mr. Olivas has always maintained employment, often at several

jobs at the same time, he has typically been employed on a contract basis with no benefits and at a low pay rate.  Thus, while it is accurate that he had been employed for some time by two trucking companies (*see* PSR ¶ 59), the work was sporadic and he did not realize much income from those jobs.

## IV.

## ARGUMENT AND AUTHORITIES

### A.   The Court Should Substantially Depart from the Mandatory Minimum Sentence.

As the plea agreement and the Presentence Report note, Mr. Olivas is eligible for the "safety valve" departure below the applicable mandatory minimum sentence.  *See* 18 U.S.C. § 3553(f); *see also* PSR ¶ 23.

### B.   The Court Should Apply a Four-Point Minimal Role Reduction to Mr. Olivas's Offense Level.

A conspiracy defendant is eligible for a minor role reduction where he is "substantially less culpable than the average participant" in the charged conspiracy.  *See* U.S.S.G. § 3B1.2 n.3(A).

The remaining question is how much of a reduction should he receive – 2, 3, or 4 levels.  The Guidelines provide a straightforward answer.  If the defendant is "plainly among the least culpable of those involved in the conduct of a group," he should receive a 4-level minimal participant reduction pursuant to U.S.S.G. § 3B1.2(a).  *See* U.S.S.G. § 3B1.2 n.4.

The Guidelines enumerate several factors that should be addressed when deciding the degree of a minor role reduction:

1. "The degree to which the defendant understood the scope and structure of the criminal activity";

2. "The degree to which the defendant participated in planning or organizing the criminal activity";

3. "The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority";

4. "The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts"; and

5. "The degree to which the defendant stood to benefit from the criminal activity."

U.S.S.G. §§ 3B1.2 n.3(C)(i)-(v).  The courts retain discretion to consider any other factors it deems relevant.

On November 1, 2015, the United States Sentencing Commission passed Amendment 794. The Commission did so because, after conducting an independent review, it found that minor role reductions were being "applied inconsistently and more sparingly than the Commission intended." U.S.S.G. App. C. Amend. 794. Specifically, "[i]n drug cases, the Commission's study confirmed that mitigating role is applied inconsistently to drug defendants who performed similar low-level functions." *Id.*

The Ninth Circuit has explained the reason for the amendment:

> Before the Commission passed the Amendment, different circuits had different methods of assessing whether a defendant was "substantially less culpable than the average participant."  In this circuit and in the Seventh Circuit, however, the relevant comparison was between the defendant and other actual participants in the crime. **The Amendment generally adopted the approach of this Court and the Seventh Circuit, stating that when a district court conducts an assessment of whether a defendant should receive a role reduction, "the defendant is to be compared with the other participants" in the crime, not with a hypothetical average participant.**

*United States v. Quintero-Leyva*, 823 F.3d 519, 522-23 (9th Cir. 2016) (citations omitted).  Expanding on the above factors set out in the new version of section 3B1.2 n.3(C), the *Quintero-Leyva* court held that the new version of Guidelines section 3B1.2 provided that a "'defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered" for the reduction, and 'the fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative'' of whether a minor-role adjustment should be granted.  *Id.* at 523.

Following *Quintero-Leyva*, the Ninth Circuit recently reiterated that the Court "recognize[s] the Sentencing Commission's statement that minor-role adjustments were being applied more sparingly than the Commission intended and its admonition that, in Amendment 794, the Commission did more than merely adopt the Ninth Circuit's side of the previous circuit split concerning consideration of hypothetical average participants." *United States v. Diaz*, 884

F.3d 911, 916 (9th Cir. 2018).[1]  The court went on to find that "[t]o the extent the district court's reasoning reflects reliance on courier conduct as dispositive of [the defendant's] eligibility for a minor-role reduction, it was error. Amendment 794 clarified that the performance of an essential role - here, the role of smuggling drugs across the border - is not dispositive."  *Id.* at 917.

The *Diaz* court described the facts of that case as follows:

Alejandro Aguilar Diaz, a 28-year-old legal resident of Tijuana, Mexico, was arrested on August 27, 2015, when crossing into the United States and charged with the importation of 10.68 kilograms of cocaine and 3.6 kilograms of heroin. On October 22, 2015, Aguilar Diaz agreed to plead guilty to two counts of drug importation in exchange for a favorable sentencing recommendation from the government.

After his arrest, Aguilar Diaz told authorities that he had agreed to transport drugs which he believed to be marijuana, to an unknown location in the United States. He explained that he was at a party with a friend, Hector Rodriguez, when they were approached by an individual named Peter and asked if they would be willing to smuggle drugs across the border because they both had border-crossing cards. They agreed, and Aguilar Diaz accompanied Rodriguez on two crossings. The first was a practice run; Aguilar Diaz and Rodriguez drove separate cars and neither car carried drugs. The purpose of the first trip was for Aguilar Diaz to show Rodriguez how to cross the border in a vehicle. Only Rodriguez attempted to smuggle drugs into the United States on the second crossing but, because Rodriguez was nervous, Aguilar Diaz agreed to go along in a separate car in exchange for $200. Rodriguez was arrested on the second crossing. When Aguilar Diaz reported Rodriguez's arrest to Peter, Peter told him that he owed a debt for the confiscated drugs and that he would be paid only $1,000 for making an additional smuggling trip, instead of the $2,000 originally promised. Aguilar Diaz then allowed Peter to hide drugs in his car, tried to cross the border a third time, and he, too, was arrested. Eventually, Aguilar Diaz pleaded guilty to two counts of

---

[1] Given the Ninth Circuit's holdings following the amendment 794, much of the contrary pre-amendment caselaw may be discarded.

1
2
3
4

> drug importation in exchange for the government's favorable
> sentencing recommendation. The pre-sentence report
> acknowledged that Aguilar Diaz cooperated after his arrest and
> during the subsequent investigation, and did not challenge his
> statement that he had only been involved in two prior crossings. It
> was undisputed that Aguilar Diaz has no prior criminal history.

5
6

*Id.* at 913.

7
8

Importantly for Mfr. Olivas's case, the *Diaz* court addressed whether the

9

District Court erred when it refused Diaz a minor-role adjustment because Diaz

10
11

could not present any evidence concerning the other likely participants in the

12

drug smuggling scheme.  The Ninth Circuit rejected the District Court's finding

13

that the absence of evidence concerning other participants doomed Diaz's

14
15

minor-role argument.  The court noted, "the Amendment recognizes that a true

16

minor-role participant need not be privy to every detail about the roles played

17

by others in the scheme. This is evident from one of the factors added by

18
19

Amendment 794: 'the degree to which the defendant understood the scope and

20

structure of the criminal activity.' The Amendment recognizes the likelihood

21

that a true minor participant may be unable to identify other participants with

22

specificity." *Id.* at 917.

23

The Court therefore must decide whether Mr. Olivas played a minor role

24

in relation to the people who participated in the same scheme, regardless of

25
26

whether Mr. Oliva can identify those people.  Given that there was a wiretap in

27

this case, it seems apparent that there are numerous "higher up" individuals

28

who were the target of the wiretap.  The wiretap affidavits submitted to the

court in this case likely detail the roles these target individuals play and establish that Mr. Oliva is far less culpable.

**C.    In Addition to Departing Below the Mandatory Minimum Sentence, the Court Should Exercise its Discretion to Impose a Sentence Well Below the Guidelines Range.**

If the minimal role reduction is applied, Mr. Olivas' Guidelines range is 87 to 108 months imprisonment.  Probation has recommended that the Court vary downward from the low-end of the otherwise applicable Guidelines range by 48 months (135 months to 87 months).  If the Court were to apply the minimal role adjustment, a sentence of 30 months would require only a slightly greater variance from the low-end of the Guidelines range - 57 months. More importantly, a sentence of 30 months imprisonment would suffice to punish Mr. Olivas's for his first serious criminal offense.

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553(a); *see also United States v. Ranum*, 353 F. Supp. 2d 984, 986 & n.1 (E.D. Wisc. 2005).  This has come to be known as "the parsimony provision."  *United States v. Jimenez-Beltre*, 440 F.3d 514, 525 & n.8 (1st Cir. 2006).

The parsimony provision requires courts to impose the minimum sentence necessary to accomplish the purposes enumerated in paragraph (2). Paragraph (2) lists those purposes as:

(A)    To reflect the seriousness of the offense, to promote respect for the law, and toprovide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant; and
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); *see also United States v. Gall,* 552 U.S. 38 (2007)

The Court must also consider the "need to avoid unwarranted sentence disparities among defendants ...." 18 U.S.C. § 3553(a)(6).  According to the United States Sentencing Commission, "unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing."  U.S. Sent. Comm., *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform,* p.113 (2004) (emphasis added).[2]

In light of the applicable guidelines in this matter, Mr. Olivas respectfully requests that the court grant a variance below the applicable guideline range and sentence him to 30 months imprisonment This request is based on the fact that it is clear that the Guideline range sentence does not meet the standards set forth in 18 U.S.C. § 3553.

---

[2] http://cdn.ca9.uscourts.gov/datastore/library/2013/02/26/Henderson_15Year.pdf

U.S. Probation notes that several aspects of Mr. Olivas' life and the circumstances of his offense warrant a variance to a sentence below the Guidelines range, including his advanced age, his minor criminal history, the collateral consequences he will suffer as a result of his conviction, and the Probation Officer's belief that Mr. Olivas is unlikely to re-offend. *See* PSR at ¶ 81, Sentencing Recommendation. Mr. Olivas obviously agrees that these are mitigating factors. He also asserts the Court should consider his financial condition and familial obligations at the time he agreed to accept a large sum of money to participate in the charged offense, as well as his culpability relative to both typical federal drug offenders and his co-defendant, Mr. Rodriguez, as bases for variance from the Guidelines range.

### 1.  Mr. Olivas's Age Warrants a Variance or Departure.

The sentencing guidelines provide that "[a]ge . . . may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1; *see also United States v. Tosti,* 733 F.3d 816 (9th Cir. 2013) ("The district court properly considered Tosti's age and physical condition at sentencing and imposed a below-guidelines sentence based on the totality of all circumstances specific to Tosti's case.").

The fact that Mr. Olivas is 63 and committed his first serious drug offense at 62 takes Mr. Olivas out of the "typical" drug cases covered by the

Guidelines.  Older prisoners such as Mr. Olivas suffer more health problems and are more vulnerable to victimization by other inmates than the typical, younger narcotics offender.  A sentence of similar duration is therefore more punitive when imposed on an older defendant.[3]

### 2.  Mr. Olivas's Financial Condition and Family Obligations Justify a Variance.

As the Presentence Reports notes, Mr. Olivas was raised in severe poverty in Mexico, dropped out of school when he was about 14, and has worked in a variety of low-paying contract jobs since he was a teen.  Mr. Olivas also has had nine children (one deceased).  All but one of Mr. Olivas's children are now adults.  Though Mr. Olivas has always been poor, he was worked hard to support his children and has maintained close, loving relationships with each of them.  At the time he committed the instant offense, Mr. Olivas was living with and supporting his wife, four-year-old daughter and adult stepson.

Mr. Olivas's poverty and extensive familial obligations do not absolve him of his mistake.  However, they do explain why Mr. Olivas was particularly vulnerable to the drug trafficker who approached him in a bar and flashed what was, to Mr. Olivas, a life-changing amount of money to participate in what seemed to Mr. Olivas to be a relatively harmless crime.[4]

---

[3] Given that Mr. Olivas suffers from heart disease, diabetes and high blood pressure and is 63, the government's recommended sentence could easily comprise a life sentence.

[4] Though the government's sentencing memorandum urges the Court to consider the seriousness of the offense in light of the current epidemic of opioid

### 3. The Collateral Consequences Mr. Olivas Will Suffer Warrant a Downward Variance.

The government, Mr. Olivas and Probation anticipate Mr. Olivas will be removed from the United States after he serves his term of imprisonment and will not be able to return.  Though Mr. Olivas's and his wife both hope his family will join him in Mexico, Mr. Olivas believes it is likely his wife and daughter will stay in the United States.  Mr. Olivas has lived in the United States for over 30 years and is unsure where he will live and what work he will be able to secure as a new arrival in Mexico in his mid-sixties.  In addition, Mr. Olivas's daughter has never known any home another than Los Angeles.  She will start school in Los Angeles while Mr. Olivas is in prison.

While Mr. Olivas's wife maintains hope that their family will re-unite in Mexico and Mr. Olivas is incredibly grateful for his wife's support, he understands that circumstances may dictate that his wife and child remain in the United States.  Mr. Olivas is a devoted to his family and separating from them would comprise a devastating collateral consequence of his conviction.

---

abuse in the United States (see Doc. #47), Mr. Olivas had no knowledge that the drugs he was transporting included fentanyl, much less any understanding that fentanyl is a growing public health concern.  Moreover, the correlation between such public policy concerns and sentencing is properly addressed by the Sentencing Commission, Congress and the Executive, not by the District Court imposing more severe punishment a single defendant in order to make an "example" out of him.

### 4.  A Substantial Variance to a Sentence of 30 Months Would Not Result in an "Unwarranted Disparity" in Sentencing.

While Mr. Olivas's proposed sentence would place him at the low-end of offender's who are convicted for distribution of the quantities of narcotics involved in this case, such a sentence would not be disproportionate to the sentences imposed nationwide on low-level "mules" who are employed by large drug trafficking organizations.  Recognizing the relatively minor culpability of such defendants, federal courts often vary or depart well below the sentences applicable to defendants who act as mere couriers.

For example, in *United States v. Valdez-Gonzalez*, 957 F.2d 643, 650 (9th Cir. 1992), the Ninth Circuit affirmed the court's departure based on the minor "mule" roles the defendants played in the drug trafficking trade.  The *Valdez-Gonzalez* defendants were Mexican nationals hired to transport drugs across the border for one or two thousand dollars per trip.  The district court examined the socioeconomics and the internal politics of the drug trade along the Mexican border and determined that the defendants were relatively blameless drug "mules," whose sentences should be mitigated to reflect their minimal roles. *Id.* at 649.

In *United States v. Patillo*, 817 F. Supp. 839 (C.D. Cal. 1993), the court found the "rationale of *Valdez-Gonzalez* compels this court to depart downward in this case to take into consideration the fact that defendant is a minor player in the drug trade which the federal laws aim to curb." *Id.* at 844.  The court noted that the defendant was "arguably he is less sympathetic than the

DEFENDANT'S SENTENCING MEMORANDUM
18-cr-00240 CRB                                    15

Mexican 'mules' in Valdez-Gonzalez" because he "had a steady job, is educated, and thus possibly was not subject to the same degree of socioeconomic pressures as Mexican couriers living in abject poverty on the border." *Id.* at 845.  The court noted, however, that that defendant still "lived in a community where the opportunities to become involved in drug trafficking are rampant, and he was subject to tremendous financial responsibilities and other pressures that cannot be judged against those faced by a typical border 'mule.'"

Though Mr. Olivas lived in the United States for many years, he is not culturally assimilated and was subject to the same pressures – financial, familial, and social – as the victimized drug couriers in *Patillo* and *Valdez-Gonzalez*.  This is undoubtedly why he was approached in a bar patronized primarily by largely poor, unsophisticated people of Sinaloan descent.

**F.  A Variance Would Result in A Proportionate and Equitable Sentence in Relation to the Co-Defendant**.

"[T]he need to avoid unwarranted sentencing disparities among co-defendants involved in the same criminal activity has long been considered a legitimate sentencing concern.  *United States v. Boshell*, 952 F.2d 1101, 1108 (9th Cir. 1991 (citing *United States v. Capriola*, 537 F.2d 319, 320-21 (9th Cir. 1976).

Mr. Olivas concedes he is more culpable than his co-defendant and adult stepson, Mr. Rodriguez.  Mr. Olivas asked Mr. Rodriguez to participate in the

scheme.  However, Olivas did not exercise any special influence on Mr. Rodriguez; he merely presented the opportunity to Rodriguez and asked him to assist.  Contrary to the government's claim in its Sentencing Memo, Mr. Olivas did not "put . . . his son-in-law at risk".  *Cf*. Doc. 41 at p.5.  Though Mr. Olivas should have never allowed Mr. Rodriguez the opportunity to make such a horrible mistake, Mr. Rodriguez made an informed decision to participate in the transportation scheme.  As the government's sentencing memorandum concerning Mr. Rodriguez notes, Mr. Rodriguez knew that he and Olivas were transporting drugs.  *See* Doc. #41 at p.3.

In its Sentencing Memorandum regarding Mr. Oliva, the government asks the Court to impose a sentence that includes 900% more incarceration than what the Court imposed on Mr. Rodriguez.  *See* Doc. #47. Yet the government does not address why the Court should treat Mr. Oliva so severely in comparison.

Though Mr. Olivas is more culpable than Mr. Olivas, he is not so far more culpable than Mr. Rodriguez in their equally serious offense.  Mr. Olivas's slightly greater responsibility for the crime justifies somewhat more punitive sentence, not the excessive sentence the government proposes.

//

//

//

## **CONCLUSION**

Considering the nature and circumstances of Mr. Olivas' crimes and the circumstances of his life, a sentence of 30 months imprisonment is a just and appropriate sentence in this case.

Dated: May 3, 2019.                    Respectfully submitted,

                                        /s/ Gilbert Eisenberg

                                       GILBERT EISENBERG
                                       Attorney for Defendant
                                       BERNARDO LEYVA OLIVAS